# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| **BETEIRO, LLC,** | |
| Plaintiff | **Case No. 6:21-cv-01150** |
| v. | **JURY TRIAL DEMANDED** |
| **PLAYUP LIMITED,** | |
| Defendant | |

## ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Beteiro, LLC ("Plaintiff") hereby files this Original Complaint for Patent Infringement against Defendant PlayUp Limited ("PlayUp" or "Defendant"), and alleges, upon information and belief, as follows:

## THE PARTIES

1.    Beteiro, LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business at 600 S. Dixie Highway, Suite 605, West Palm Beach, Florida 33401.

2.    Upon information and belief, Defendant is a privately-held foreign company organized and existing under the laws of Australia, with a principal place of business located at 48 Epson Road, Zetland NSW 2017, Sydney, Australia.   Defendant may be served through its corporate representatives located at 48 Epson Road, Zetland NSW 2017, Sydney, Australia.  Alternatively, and on information and belief, Defendant may be served through its registered agent for service in the State of Colorado at: InCorp Services, Inc., 36 South 18th Avenue, Suite D, Brighton,

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                                                                   1

Colorado 80601.  Upon information and belief, PlayUp distributes, makes, uses, makes available, promotes, sells, offers to sell, and generates substantial revenues from products and services throughout the United States, including but not limited to the Internet domain registered and existing at www.playup.com and its related Mobile Applications.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338(a).

4.      This Court has specific personal jurisdiction over Defendant.  On information and belief, Defendant has continuous and systematic business contacts with the United States generally, including but not limited to the ownership, operation, and promotion of infringing Internet gambling domains and Mobile Wagering Platforms as identified herein.  Moreover, on information and belief, Defendant generates substantial revenues from consumers across the United States from its infringing Mobile Wagering Platforms.  Defendant's activities and business connections in the United States are extensive, such that the maintenance of this suit in this District does not offend traditional notions of due process, fair play, and substantial justice.









*See https://www.playup.com/.*



*See https://corporate.playup.com/.*



*See https://www.linkedin.com/company/playup-ltd/about/.*

5.      On information and belief, PlayUp provides gambling and event wagering services, including but not limited to providing and supporting its branded Mobile Wagering Platform, which operate under the "PlayUp" brand name and the Internet website located at www.playup.com, which is

comprised of hardware (including servers) and software (including source code).   On information and belief, such hardware and software are made, used, sold, offered for sale, and tested on the authority and under the direction of PlayUp.   Such branded Mobile Wagering Platform of PlayUp is directly accessible to users in the United States through the Internet domains and mobile applications of PlayUp.

6.      Venue is proper in the Western District of Texas as to Defendant pursuant to at least 28 U.S.C. §§ 1391(b) and (c) and 1400(b), as well as under the "alien venue rule."   *Brunette Machine Works, Ltd. v. Kockum Indus., Inc.,* 406 U.S. 706 (1972); *In re HTC Corp.,* 889 F.3d 1349 (Fed. Cir. 2018); *Weatherford Tech. v. Tesco Corp.,* 2018 WL 5315206 at *2-3 (E.D. Tex. Oct. 26, 2018).   As noted above, Defendant is a foreign entity which maintains a regular and established business presence in the United States by virtue of its readily-accessible Internet domain, mobile applications, and Mobile Wagering Platform.

## PATENTS-IN-SUIT

7.      Plaintiff is the sole and exclusive owner, by assignment, of U.S. Patent Nos. 9,965,920 ("the '920 Patent"); 10,043,341 ("the '341 Patent"); 10,147,266 ("the '266 Patent"); and 10,255,755 ("the '755 Patent") (hereinafter collectively referred to as "the Beteiro Patents").

8.      By operation of law, the Beteiro Patents were originally issued and exclusively vested to the sole named inventor, Raymond Anthony Joao, as of the date of their respective issuances.   *See* 35 U.S.C. § 261; *Schwendimann v. Arkwright Advanced Coating, Inc.,* 959 F.3d 1065, 1072 (Fed. Cir. 2020); *Suppes v. Katti,* 710 Fed. Appx. 883, 887 (Fed. Cir. 2017); *Taylor v. Taylor Made Plastics, Inc.,* 565 Fed. Appx. 888, 889 (Fed. Cir. 2014).   Mr. Joao, in a written instrument dated March 6, 2012, and filed with the United States Patent and Trademark Office on May 7, 2015 at Reel 035604 and Frames 0126-0132, assigned all rights, title, and interest in the Beteiro Patents

to GTJ Ventures, LLC.  Thereafter, in a written instrument dated June 15, 2021, and filed with the United States Patent and Trademark Office on June 16, 2021 at Reel 056566 and Frames 0057-0060, GTJ Ventures assigned all rights, title, and interest in the Beteiro Patents to the Plaintiff, Beteiro, LLC.  As such, Plaintiff Beteiro LLC has sole and exclusive standing to assert the Beteiro Patents and to bring these causes of action.

9.     The Beteiro Patents are valid, enforceable, and were duly issued in full compliance with Title 35 of the United States Code.

10.    The inventions described and claimed in the Beteiro Patents were invented individually and independently by Raymond Anthony Joao.

11.    Mr. Joao is a prolific inventor, with more than 80 issued United States Patents to his credit.  The Beteiro Patents represent substantial advancements in the gambling industry which were unconventional at the time of invention.  In fact, Mr. Joao is extremely knowledgeable in the field, having earned: (i) a Masters Degree in Sports Management from Columbia University (New York); and (ii) a Masters Degree in Global Sports Law from Instituto Superior de Derecho y Economia (Madrid, Spain).

12.    The Beteiro Patents each include numerous claims defining distinct inventions.

13.    The priority date of each of the Beteiro Patents is at least as early as May 31, 2002.  As of the priority date, the inventions as claimed were novel, non-obvious, unconventional, and non-routine.  Among other things, as of the priority date, the mobile gaming industry was essentially non-existent.  The first mobile gaming venture to launch internationally did not arise until 2003 in the United Kingdom, and that in the form of an elementary interactive instant win game.  *See, e.g., https://www.gamblingcommission.gov.uk/for-the-public/National-Lottery/About-the-National-Lottery.aspx.*  The concept of geolocation restrictions on such gaming platforms was

not routine as of the priority date, and did not become so until many years thereafter.  Indeed, it was not until 2006 that the Nevada Gaming Control Board first cleared the way for wireless gambling in the United States.  Even at that time, the primary concern was over data security and identity controls, not geolocation *See https://www.nytimes.com/2006/05/03/technology/techspecial3/03gamble. html?smid=url-share.*

14.   As further evidence of the non-routine and unconventional nature of the solutions captured in the Beteiro Patents is the stated position of the now-leading geolocation provider in the United States that: "Historically, the notion that you could indeed draw geographical boundaries on the internet would have been laughable; such was the weakness of the original technologies and the availability of cheap and easy methods to fake your location online." *See https://www.geocomply.com/paspa-geolocation-compliance/.*  As such, the prevailing view as of the date of invention was to avoid global positioning as a means of legal compliance.

15.   As further evidence of the stated non-routine aspects of the inventions, during prosecution of the '920 Patent, Primary Examiner Jasson Yoo specifically and expressly considered whether the claims of the '920 Patent were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*.  Examiner Yoo affirmatively and expressly found that the claims are in fact patent eligible under 35 USC §101 because: (i) all claims explicitly require the use of a particular machine or processor to detect the posting of information; (ii) all claims explicitly require the use of a particular machine or processor to generate and transmit a notification message to a communication device; (iii) all claims explicitly require the use of a particular receiver for receiving a bet message including location information; and (iv) all claims explicitly require the use of a particular machine or processor to determine whether the bet is allowed or disallowed by using GPS.  *See* Notice of Allowability, dated March 16, 2018.

16.     As further evidence of the stated non-routine aspects of the inventions, during prosecution of the '341 Patent, Primary Examiner Jasson Yoo specifically and expressly considered whether the claims of the '341 Patent were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*.  Examiner Yoo affirmatively and expressly found that the claims are in fact patent eligible under 35 USC §101 because: (i) all claims explicitly require the use of a particular machine or processor to detect the posting of information; (ii) all claims explicitly require the use of a particular machine or processor to generate and transmit a notification message to a communication device; (iii) all claims explicitly require the use of a particular machine or processor for receiving a bet message including location information; and (iv) all claims explicitly require the use of a particular machine or processor to determine whether the bet is allowed or disallowed by using GPS.  *See* Notice of Allowability, dated June 11, 2018.

17.     As further evidence of the stated non-routine aspects of the inventions, during prosecution of the '266 Patent, Primary Examiner Jasson Yoo specifically and expressly considered whether the claims of the '266 Patent were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*.  Examiner Yoo affirmatively and expressly found that the claims are in fact patent eligible under 35 USC §101 because: (i) all claims explicitly require the use of a particular machine or processor to detect the posting of information; (ii) all claims explicitly require the use of a particular machine or processor to generate and transmit a notification message to a communication device; (iii) all claims explicitly require the use of a particular machine or processor for receiving a bet message including location information; and (iv) all claims explicitly require the use of a particular machine or processor to determine whether the bet is allowed or disallowed by using GPS.  *See* Notice of Allowability, dated June 11, 2018.

18.     As further evidence of the stated non-routine aspects of the inventions, during prosecution of Application No. 16/939,030, Primary Examiner Jasson Yoo specifically and expressly considered whether the then-pending claims were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*.   Examiner Yoo affirmatively and expressly found that the claims are in fact patent eligible under 35 USC §101 because: (i) all claims integrate the invention into a practical application by providing an improvement to a technical field; (ii) all claims provide an improvement to a technical field by allowing individuals to access gaming or gambling venues and/or activities without requiring them to be physically located at gaming or gambling venues and/or activities; (iii) all claims provide individuals with information regarding the gaming or gambling venues so that bets can be placed from a remote location; (iv) all claims achieve the stated benefits by: (a) detecting a posting of information regarding a gaming activity, gambling activity or sporting event, and (b) generating a notification message regarding the gaming activity, gambling activity or sporting event; (v) in all claims a global position device is used to determine a position or location information of a communication device associated with the individual, and allowing or disallowing the activity request or bet based on the position or location information; as such, the claimed machine is required and imposes a meaningful limit on the scope of a claim and plays a significant part in permitting the claimed method to be performed; (vi) at the time the application was filed, the use of global positioning systems for various applications and providing a user a message if a posting was detected were not as well-known as today; in fact, and as indicated in the specification, prior art systems failed to provide a system that allows individuals access to particular gaming venues or gaming activities, and did not provide individuals certain information for enhancing their experience; and (vii) the claimed invention provides an improvement to online betting and

therefore is integrated into a practical application.  *See* Notice of Allowability, dated October 27, 2021.

19.     Plaintiff alleges infringement on the part of Defendant of the '920 Patent, the '341 Patent, the '266 Patent, and the '755 Patent (collectively as the "Asserted Patents").

20.     The '920 Patent relates generally to an apparatus, including a processor, specially programmed to detect a posting of information regarding a sporting event for which a bet can be placed, which detects the posting regarding the sporting event and generates a notification message containing information regarding the sporting event.  The apparatus initiates a communication link with a first user communication device and transmits the notification message to the first user communication device via the communication link; a receiver which receives a bet message, containing information regarding a bet on or regarding the sporting event, transmitted from the first user communication device or a second user communication device; and a transmitter.  The apparatus or processor processes information for placing the bet and the transmitter transmits video information or audio information regarding, and obtained at, the sporting event to the first user communication device, the second user communication device, or a third user communication device.  *See* Abstract, '920 Patent.

21.     The '341 Patent relates generally to an apparatus, including a computer including a processor which detects a posting of information regarding a gaming activity, gambling activity, or sporting event, and generates the notification message.  The computer initiates a communication link with a first device and transmits the notification message to the first device.  The computer receives a bet message transmitted from the first device or from a second device.  The first device or second communication device includes a global positioning device and a display.  The bet message contains information regarding a bet to be placed and information regarding the

position or location of the first device or second device at a time of a transmission of the bet message.  The computer determines if the bet is allowed or disallowed using position or location information of the first device or the second device.  *See* Abstract, '341 Patent.

22.     The '266 Patent relates generally to an apparatus, including a computer.  The computer detects a posting of information regarding a gaming activity, gambling activity, or sporting event, and generates a notification message.   The computer initiates a communication link with, and transmits the notification message to, a first communication device, or the computer transmits the notification message as an electronic mail message which is received by a first communication device.   The computer receives a bet message transmitted from the first communication device or a second communication device. The first communication device or second communication device includes a global positioning device which determines a position or location of the first communication device or second communication device.  The computer determines if the bet is allowed or disallowed using the position or location information.  If allowed, the computer processes information for placing the bet.  If disallowed, the computer processes information for disallowing the bet.  *See* Abstract, '266 Patent.

23.     The '755 Patent relates generally to a method and apparatus, including: detecting, with a computer, a posting of information regarding a gaming activity, gambling activity, or sporting event; generating a notification message regarding the same; initiating a communication link with, and transmitting the notification message to, a first communication device as an electronic transmission, or transmitting the notification message as an electronic mail message; receiving a bet message transmitted from the first communication device or a second communication device, wherein the first communication device or the second communication device comprises a global positioning device which determines a position or location of the first communication device or

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

second communication device, wherein the bet message contains information regarding a bet to be placed regarding the activity or event, and information regarding the position or location of the first communication device or second communication device; and determining whether the bet is allowed or disallowed using the position or location information.  *See* Abstract, '755 Patent.

24.    As noted, the claims of the Asserted Patents have priority to at least May 31, 2002.  At that time, the use of geolocation and global positioning as an integral data point in the processing of mobile wagers was still many years away.  For example, the first GPS chip to be incorporated into a mobile device with sufficient sensitivity to assess the ability of an individual to place a wager in a given jurisdiction was the GL20000 GPS Chip, which was first used in the HP iPaq in 2005.

25.    Still further, the current industry leader in the space – GeoComply – did not even exist until 2011, nearly a full decade later than the nominal date of invention in May 2002.  *See, e.g., https://www.geocomply.com/about-us/.*   This fact alone is compelling evidence of the non-routine and unconventional inventive concepts captured in the claims of the Beteiro Patents.

26.    The claims of the Asserted Patents are not drawn to laws of nature, natural phenomena, or abstract ideas.  Although the systems and methods claimed in the Asserted Patents are ubiquitous now (and, as a result, are widely infringed), the specific combinations of elements, as recited in the claims, were not conventional or routine at the time of the invention.

27.    Further, the claims of the Asserted Patents contain inventive concepts which transform the underlying non-abstract aspects of the claims into patent-eligible subject matter.

28.    Consequently, the claims of the Asserted Patents recite apparatuses and methods resulting in improved functionality of the claimed systems and represent technological improvements to the operation of computers.  The claims of the Asserted Patents provide a basis for legally compliant

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                              12

remote wagering, increased accessibility to wagering platforms, increased opportunity for wagering providers, increased accessibility to wagering information to wagerers, reduced fraud, and more secure transactions among wagering providers and wagerers. *See, e.g.,* '920 Patent at 2:5-7:58.

29.     The claims of the Asserted Patents overcome deficiencies existing in the art as of the date of invention, and comprise non-conventional approaches that transform the inventions as claimed into substantially more than mere abstract ideas.  For example, as of the date of invention, "[w]hile many individuals enjoy gambling and/or enjoy engaging in gaming activities and/or gambling activities, they may not always have access to particular gaming venues or gaming activities.  Further, while many individuals may also be interested in making a gaming and/or gambling experience more interesting, more challenging, and/or more exciting, they typically do not have access to certain information, products, and/or services, for enhancing their experience or experiences." '920 Patent at 1:44-52.  The inventions as claimed overcome these deficiencies in the state of the art, and provide a means by which interested parties can access gambling services remotely, while preserving geographic restrictions on such access.  As explained, as of the date of invention, "prior art gaming systems and/or gambling systems, as well as conventional gaming practices and/or gambling practices, have failed to provide the gaming community with services, products, and/or other offerings, which would provide for more enhanced gaming and/or gambling activities, environments, and/or experiences." '920 Patent at 1:53-58.

30.     As of the date of invention (and still today), different jurisdictions had different laws relating to gambling activities, but no effective way to administer and regulate electronic and online wagering.  Accordingly, the inventions as claimed provided a technological solution to the

technological problems arising in the online wagering context.  As explained: "The present invention can be utilized to facilitate compliance with the various and respective state, country, and/or sovereignty, gaming laws and/or gambling laws and/or so as to facilitate any reporting of gaming activities and/or gambling activities to the appropriate state, country, and/or sovereignty, authorities and/or so as to facilitate any payments of fees and/or taxes relating to the gaming activities and/or gambling activities."  '920 Patent at 16:14-21.  Indeed, one of the express objects of the inventions as claimed was "to provide an apparatus and method for facilitating gaming activity and/or gambling activity which utilize global positioning technology in order to ascertain the jurisdiction in which or from which a bet is placed."  '920 Patent at 26:14-18.  Such a solution was unconventional as of the date of invention, especially in view of the state of the art at the time, which was dependent upon in-person wagering.

31.     The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by providing a means by which gambling platform providers could more effectively market various gaming activities to wider audiences.  As explained, the inventions as claimed overcome these deficiencies by "allow[ing] a user or player to access a central processing computer and search for a gaming activity, gaming activities, a gaming event, or gaming events, in which the user or player may desire to bet or participate."  '920 Patent at 32:6-10.  As such, the inventions as claimed provide non-conventional solutions to the conventional problems of the day by making it possible to expose more individuals to the various gaming options available in the market.

32.     The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by providing methods and apparatuses for providing wagering opportunities on an increased scale over traditional person-to-person live wagering.  As explained, the inventions as

claimed overcome prior deficiencies in this regard because "the apparatus 100 also includes any number of user computers or user communication devices 20." '920 Patent at 35:65-67.  As such, the inventions as claimed provide non-conventional solutions to the conventional problems of the day because the wagering platform providers can maximize the number of wagers made without a proportional increase in overhead, wagering equipment/terminals, or employee capacity.

33.    As noted, as of the date of invention (and still today), different jurisdictions had different laws relating to gambling activities, but no effective way to administer and regulate electronic and online wagering.   A key problem as of the date of invention was the inability of wagering platform providers to geographically restrict access by remote participants.   Accordingly, the inventions as claimed provided a technological solution to the technological problems arising in the online wagering context by unconventionally adapting the mobile devices used by wagering participants so as to create new mobile gaming machines.   As explained: "[T]he user communication device 20 can also include a global positioning device 20J for determining the position or location of the user communication device 20.  In a preferred embodiment, the global positioning device 20J can be utilized to determine the position or location of the user communication device 20 so as to, for example, determine a jurisdiction in which the user communication device 20 is located and/or is being utilized." '920 Patent at 44:37-44.  As such, the inventions as claimed provided non-conventional solutions to the conventional problems of the day.  Indeed, the very infringing scenarios in existence today were contemplated and foreseen by the inventor many years ago: "In another preferred embodiment, wherein the user communication device 20 is a wireless communication device and/or a mobile communication device (*i.e.* personal digital assistant, wireless videophone, wireless telephone, or palm-held

device, etc., which can be equipped with a global positioning system (GPS) device 20J), the location of the user communication device 20 and, therefore, the location from which the gaming activity and/or gambling activity originates and/or from which it takes place can be determined by the user communication device 20 automatically transmitting position data and/or information to the respective central processing computer 10 and/or gaming facility computer 30 at the time of the user's accessing of the respective central processing computer 10 and/or gaming facility computer 30." '920 Patent at 80:10-24.  Again, this scenario was far from conventional as of the date of invention, as evidenced by the fact that the first iPhone was not introduced to the market until 2007, and the common "app-store" did not exist until 2008, many years after the date of invention.                              *https://en.wikipedia.org/wiki/IPhone*                              and *https://en.wikipedia.org/wiki/App_Store_(iOS/iPadOS)*.  Moreover, as of 2002, it was effectively illegal in the United States to even wager on athletic events, much less to do so remotely.  More specifically, the Professional and Amateur Sports Protection Act of 1992 was the federal law in effect from October 1992 until it was declared unconstitutional by the United States Supreme Court in May 2018.  *See Murphy v. National Collegiate Athletics Association,* 138 S.Ct. 1461 (2018).  In view of the prevailing and long-standing laws in the United States, the inventive concepts captured in the claims of the Beteiro Patents were plainly unconventional and non-routine.

34.     As noted, as of the date of invention (and still today), different jurisdictions had different laws relating to gambling activities, but no effective way to administer and regulate electronic and online wagering.  A key problem as of the date of invention was the inability of wagering platform providers to geographically restrict access by remote participants.  Accordingly, the inventions as claimed provided a technological solution to the technological problems arising in

the online wagering context by creating unconventional central processing computers specially programmed to assess the legality of proposed wagers in real-time.  As explained: "At step 2003, the respective central processing computer 10 and/or gaming facility computer 30 can determine if the remote gaming activity and/or gambling activity is allowed by the state having jurisdiction over the remote gaming activity and/or gambling activity.  If, at step 2003, the respective central processing computer 10 and/or gaming facility computer 30 determines that the remote gaming activity and/or gambling activity is disallowed by the identified state having jurisdiction over same, then the operation of the apparatus 100 will proceed to step 2004 and the respective central processing computer 10 and/or gaming facility computer 30 will cancel the respective bet, wager, and/or gaming activity and/or gambling activity."  '920 Patent at 80:37-50.  As such, the claimed "central processing computer" does not merely comprise standard conventional hardware and software; rather, as claimed, it advances the functionality of the computer as a useful tool in the electronic processing of wagers, the prevention of illegal gambling, and providing a measure of compliance on the part of wagering platform providers.

35.     As noted above, during prosecution of each of the '920 Patent, the '341 Patent, and the '266 Patent, the Primary Patent Examiner specifically considered whether the claims at issue were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*.  In each instance, after due consideration, the Primary Patent Examiner expressly found that the claims are in fact patent eligible under 35 USC §101 because: (i) all claims explicitly require the use of a particular machine or processor to detect the posting of information; (ii) all claims explicitly require the use of a particular machine or processor to generate and transmit a notification message to a communication device; (iii) all claims explicitly require the use of a particular machine or processor for receiving a bet message including location information; and

(iv) all claims explicitly require the use of a particular machine or processor to determine whether the bet is allowed or disallowed by using GPS.  The Primary Patent Examiner was, in each instance, correct.  For these same reasons, all of the claims of the Asserted Patents are patent-eligible.

36.   The '920 Patent was examined by Primary United States Patent Examiner Jasson Yoo.  During the examination of the '920 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: CPC, A63F 13/00; A63F 9/24; G07F 17/32; G07F 17/3244; G07F 17/3237; G07F 17/3223; and G07F 17/3288.

37.   After conducting a search for prior art during the examination of the '920 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) US6104815; (ii)   US6113493; (iii) US2002/0002075; (iv) US2002/0054088; (v) US2002/0098829; (vi) US6443841; (vii) US2002/0147049; (viii) US20020183105; and (ix) US6508709.

38.   After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '920 Patent to issue.  In so doing, it is presumed that Examiner Yoo used his knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Yoo has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).  In view of the foregoing, the claims of the '920 Patent are novel and non-obvious, including over all non-cited art which is merely cumulative with the referenced and cited prior art.  Likewise, the claims of the '920 Patent are novel and non-obvious, including

over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by Examiner Yoo.

39.     The '920 Patent is a pioneering patent, and has been cited as relevant prior art in over 25 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Marketmaker Software, Ebay, Apple, WMS Gaming, Sony, Intralot, Joingo, and Metric Gaming.

40.     The '341 Patent was examined by Primary United States Patent Examiner Jasson Yoo.  During the examination of the '341 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: G07F 17/3237; G07F 17/3288; G07F 17/3223; G07F 17/3244; and G07F 17/32.

41.     After conducting a search for prior art during the examination of the '341 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) US6104815; (ii) US9965920; and (iii) 2002/0183105.

42.     After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '341 Patent to issue.  In so doing, it is presumed that Examiner Yoo used his knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Yoo has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).  In view of the foregoing, the claims of the '341 Patent are novel and non-obvious, including over all non-cited art which is merely cumulative with the referenced and

cited prior art.  Likewise, the claims of the '341 Patent are novel and non-obvious, including over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by Examiner Yoo.

43.    The '341 Patent is a pioneering patent, and has been cited as relevant prior art in over 25 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Marketmaker Software, Ebay, Apple, WMS Gaming, Sony, Intralot, Joingo, and Metric Gaming.

44.    The '266 Patent was examined by Primary United States Patent Examiner Jasson Yoo.  During the examination of the '266 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: G07F 17/3237; G07F 17/3288; G07F 17/3223; G07F 17/3244; and G07F 17/32.

45.    After conducting a search for prior art during the examination of the '266 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) US6104815; and (ii) 2002/0183105.

46.    After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '266 Patent to issue.  In so doing, it is presumed that Examiner Yoo used his knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Yoo has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).  In view of the foregoing, the claims of the '266 Patent are novel and non-

obvious, including over all non-cited art which is merely cumulative with the referenced and cited prior art.  Likewise, the claims of the '266 Patent are novel and non-obvious, including over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by Examiner Yoo.

47.   The '266 Patent is a pioneering patent, and has been cited as relevant prior art in over 25 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Marketmaker Software, Ebay, Apple, WMS Gaming, Sony, Intralot, Joingo, and Metric Gaming.

48.   The '755 Patent was examined by Primary United States Patent Examiner Jasson Yoo.  During the examination of the '755 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: G07F 17/3237; G07F 17/3288; G07F 17/3223; G07F 17/3244; and G07F 17/32.

49.   After conducting a search for prior art during the examination of the '755 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) US6106815; and (ii) 2002/0183105.

50.   After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '755 Patent to issue.  In so doing, it is presumed that Examiner Yoo used his knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Yoo has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345

(Fed. Cir. 2002).  In view of the foregoing, the claims of the '755 Patent are novel and non-obvious, including over all non-cited art which is merely cumulative with the referenced and cited prior art.  Likewise, the claims of the '755 Patent are novel and non-obvious, including over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by Examiner Yoo.

51.    The '755 Patent is a pioneering patent, and has been cited as relevant prior art in over 25 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Marketmaker Software, Ebay, Apple, WMS Gaming, Sony, Intralot, Joingo, and Metric Gaming.

52.    The claims of the Asserted Patents were all properly issued, and are valid and enforceable for the respective terms of their statutory life through expiration, and are enforceable for purposes of seeking damages for past infringement even post-expiration.  *See, e.g., Genetics Institute, LLC v. Novartis Vaccines and Diagnostics, Inc.,* 655 F.3d 1291, 1299 (Fed. Cir. 2011) ("[A]n expired patent is not viewed as having 'never existed.'  Much to the contrary, a patent does have value beyond its expiration date.  For example, an expired patent may form the basis of an action for past damages subject to the six-year limitation under 35 U.S.C. § 286") (internal citations omitted).

53.    The expiration dates of the Beteiro Patents are at least the following: the '920 Patent expires no earlier than May 19, 2023; the '341 Patent expires no earlier than May 19, 2023; the '266 Patent expires no earlier than May 19, 2023; and the '755 Patent expires no earlier than May 19, 2023.

## THE ACCUSED INSTRUMENTALITIES

54.   Upon information and belief, Defendant makes, sells, advertises, offers for sale, uses, or otherwise provides a plurality of gambling and event wagering services, including but not limited to providing and supporting its branded Mobile Wagering Platform, which is comprised of hardware (including servers) and software (including source code).  On information and belief, such hardware and software are made, used, sold, offered for sale, and tested on the authority and under the direction of PlayUp.  Such branded Mobile Wagering Platform of PlayUp is directly accessible to users in the United States through the Internet domains and mobile applications of PlayUp.  On information and belief, the PlayUp system comprises servers and/or computers with receivers, memory, processors, and transmitters, together with the interactive Internet domains and mobile applications of PlayUp which collectively operate as a single controlled apparatus to administer the PlayUp branded Mobile Wagering Platform in the United States.  On information and belief, the PlayUp branded Mobile Wagering Platform offered by PlayUp is marketed as the PlayUp Websites (including but not limited to https://co.playupusa.com and https://nj.playupusa.com) and the PlayUp Mobile Applications (including but not limited to the PlayUp Sportsbook, PlayUp Sports Betting NJ, and PlayUp Sports Betting CO versions) (collectively the "PlayUp Domains").  Collectively, all of the foregoing comprise the "Accused Instrumentalities."  *See* Figure Group A.



See https://nj.playupusa.com/en-us/home.



See https://nj.playupusa.com/en-us/sports/american_football/event/new-york-jets-@-indianapolis-colts?id=512160.



*See https://apps.apple.com/us/app/playup-sports-betting-nj/id1578724423#?platform=iphone.*

**FIGURE GROUP A**

55.     On information and belief, the Accused Instrumentalities collect, process, and utilize location information relative to the specific communication device (*e.g.,* the laptop computer or mobile device) of the PlayUp interactive Internet domain and/or mobile application associated with individual users of the PlayUp Wagering Platform.   On information and belief, acceptance and use of such location information is a requirement imposed by PlayUp on all users of the infringing Accused Instrumentalities in the United States.   *See* Figure Group B.

**CONSENT TO TRACK LOCATION OF YOUR WIRELESS DEVICE.**

CONSENT TO TRACK LOCATION OF YOUR WIRELESS DEVICE. To participate in mobile account wagering on your wireless device you must have a wireless device that is compatible with the PlayUp App. We do not represent or warrant that the PlayUp App will be compatible with your wireless device. Enabling Your Device the PlayUp App must access GPS and other location information associated with your wireless device. You agree to enable your wireless device to allow us to access your wireless device's location information from time to time, and consent to us verifying your location using GPS or other location technologies. The Wireless Carrier owns location-based information. By entering into this Agreement, you acknowledge and agree that the location of your wireless device is information that is owned by your wireless carrier, and you have no expectation of privacy when using your sports wagering account as it relates to identifying the location of your wireless device. You agree at all times not to disable GPS tracking from any device you use while using the PlayUp App. Attempts to circumvent location tracking may lead to a closure of your account.

*See https://nj.playupusa.com/en-us/termsandconditions?id=512160.*

**FIGURE GROUP B**

56.    On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the PlayUp Wagering Platform accepts wagers, including but not limited to one or more of the following: (i) Colorado, as licensed and regulated by the Colorado Department of Revenue – Division of Gaming; (ii) Illinois, as licensed and regulated by the Illinois Gaming Board; (iii) Indiana, as licensed and regulated by the Indiana Gaming Commission; (iv) Iowa, as licensed and regulated by the Iowa Racing and Gaming Commission; (v) Michigan, as licensed and regulated by the Michigan Gaming Control Board; (vi) New Hampshire, as licensed and regulated by the New Hampshire Lottery Commission; (vii) New Jersey, as licensed and regulated by the New Jersey Division of Gaming Enforcement; (viii) Pennsylvania, as licensed and regulated by the Pennsylvania Gaming Control Board; (ix) Tennessee, as licensed and regulated by the Tennessee Education Lottery Corporation; (x) Virginia, as licensed and regulated by the Virginia Lottery; (xi) West Virginia, as licensed and regulated by the West Virginia Lottery Commission; (xii) Montana, as licensed and regulated by the Montana Lottery; (xiii) Nevada, as licensed and regulated by the Nevada Gaming Commission; (xiv) Oregon, as licensed and regulated by the Oregon Lottery; and (xv) Rhode Island, as licensed and regulated by the Rhode Island Lottery.

57.    On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the PlayUp Wagering Platform

accepts wagers, including but not limited to the United States Unlawful Internet Gambling Enforcement Act of 2006 (31 U.S.C. §§ 5361-5367).

58.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the PlayUp Wagering Platform accepts wagers, including but not limited to the Colorado Department of Revenue – Enforcement Division, Gaming Sports Industry Bulletin Number 3, dated April 20, 2020.

59.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the PlayUp Wagering Platform accepts wagers, including but not limited to Section 1900.1430 of Title 11, Section E, Chapter I of the Illinois Administrative Code.

60.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the PlayUp Wagering Platform accepts wagers, including but not limited to: (i) Chapter 11 of Indiana Title 68 – Indiana Gaming Commission Emergency Rule 20-448E, dated August 17, 2020; and (ii) IC 4-38-3-1 of Indiana Title 4 (Indiana Sports Wagering Statute).

61.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the PlayUp Wagering Platform accepts wagers, including but not limited to Technical Bulletin 2020-01, dated August 6, 2020, as issued by the Michigan Gaming Control Board.

62.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the PlayUp Wagering Platform accepts wagers, including but not limited to Section 287-I:7 of Title XXIV of the New Hampshire Statutes.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                              27

63.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the PlayUp Wagering Platform accepts wagers, including but not limited to Section 2(m) of New Jersey Assembly Bill 4111, dated June 4, 2018.

64.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the PlayUp Wagering Platform accepts wagers, including but not limited to the Pennsylvania Expanded Gaming Act, as well as Section 809.07 of Title 58 of the Pennsylvania Code.

65.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the PlayUp Wagering Platform accepts wagers, including but not limited to Rule 15.1.7 (Q) of Chapter 15 of the Tennessee Sports Gaming Regulations, as promulgated by the Tennessee Education Lottery Corporation, as well as the TELC Technical Bulletin Issued August 24, 2020 relating thereto.

66.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the PlayUp Wagering Platform accepts wagers, including but not limited to Section 50.1-4034 of Title 58.1, Chapter 40, of the Virginia State Code.

67.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the PlayUp Wagering Platform accepts wagers, including but not limited to Section 29-22D-15 of West Virginia 2018 Senate Bill 415.

68.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the PlayUp Wagering Platform accepts wagers, including but not limited to Montana House Bill 725 (2019).

69.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the PlayUp Wagering Platform accepts wagers, including but not limited to Sections 22.140 and 22.145 of Regulation 22 of the Nevada Gaming Control Board.

70.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the PlayUp Wagering Platform accepts wagers, including but not limited to Section 177-092-0025 of Chapter 177, Division 92 as promulgated by the Oregon State Lottery.

71.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the PlayUp Wagering Platform accepts wagers, including but not limited to Sections 20.20(H) and 20.32 of the Rhode Island Lottery Rules and Regulations, dated December 2020.

## COUNT I
## Infringement of U.S. Patent No. 10,043,341

72.     Plaintiff incorporates the above paragraphs by reference.

73.     Defendant has been on actual notice of the '341 Patent at least as early as the date it received service of the Original Complaint in this litigation.

74.     Upon information and belief, Defendant owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

75.     Upon information and belief, Defendant has directly infringed and continues to directly infringe at least Claim 13 of the '341 Patent by making, using, importing, selling, and/or offering for sale

the Accused Instrumentalities.    Defendant directly makes the infringing Accused Instrumentalities at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom.    More specifically, and on information and belief, Defendant: (i) developed and maintains the infringing PlayUp Domains; (ii) authored and owns the source code on which the PlayUp branded Mobile Wagering Platform functions; (iii) took affirmative steps to assemble and finance the hardware (including servers and/or computers with receivers, memory, processors, and transmitters) on which the Accused Instrumentalities operate; (iv) manages and controls the functionality on all such hardware, including by managing and controlling the software in use on such hardware; (v) specifically embeds and/or requires the presence and use of global positioning devices as part of the PlayUp branded Mobile Wagering Platform; (vi) assumes ownership, credit, and responsibility for the Accused Instrumentalities by its overt branding and advertising of same; and (vii) receives substantial financial returns from the infringing operations of the Accused Instrumentalities.    *See* Figure Groups A, B, and C. Defendant further directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them collectively available in the United States.    Further, and on information and belief, Defendant has directly infringed by using the infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities.    More specifically, in order to maintain legal compliance in the United States, PlayUp is required to periodically monitor and ensure that the Accused Instrumentalities are performing as designed and intended, including but not limited to the enforcement of geographical restrictions of use.    Such testing and legal compliance necessarily requires PlayUp to make and use the Accused Instrumentalities in an infringing manner.    Still

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                         30

further, Defendant is a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the infringing Accused Instrumentalities. *See* Figure Group A.

76.     The Accused Instrumentalities comprise an apparatus including a computer, wherein the computer is specially programmed for processing information for providing for a placement of a bet on or regarding a sporting event.   As noted above, and on information and belief, the Accused Instrumentalities collectively comprise the PlayUp branded Mobile Wagering Platform, which is comprised of hardware (including servers) and software (including source code).   Such branded Mobile Wagering Platform of PlayUp is directly accessible to users in the United States through the PlayUp Domains.   On information and belief, the PlayUp system comprises servers and/or computers with receivers, memory, processors, and transmitters, together with the interactive Internet domains and mobile applications of PlayUp which collectively operate as a single controlled apparatus to administer the PlayUp branded Mobile Wagering Platform in the United States.   The existence of the PlayUp branded Mobile Wagering Platform necessarily requires the presence and use of a specially programmed computer or computer system, including Internet servers.   As illustrated immediately below, such computer is specially programmed for offering, accepting, monitoring, and fulfilling wagers made by individuals on various events, including sporting events.   Such activities comprise "processing information for providing for a placement of a bet."  *See* Figure Group C.



*See https://nj.playupusa.com/en-us/live.*

ACCOUNT STATEMENTS PlayUp will provide an account statement with account details for you to review on demand at all times, which includes detailed account activity for at least the six months preceding 24 hours before your request. Within your PlayUp account, you will have access to your deposit and withdrawal history, your win and loss statistics, your beginning and ending account balances, and your self-imposed responsible gaming limit history, if applicable. You always have the right to set your own responsible gaming limits at PlayUp. Upon accessing your PlayUp sports wagering account you warrant that: (i) you understand and accept the risk that, by using our services and content, you may, as well as winning money, lose money, (ii) you satisfy the Age Requirements, (iii) you are legally able to enter into contracts, (iv) you are not a person barred from receiving our Services and/or using our Content, under federal, state, and/or local laws, (v) you are the rightful owner of the money which you at any time deposit in or withdraw from your account, and (vi) you are located within the State of New Jersey when using our services and content. (vii) you are not prohibited from wagering on sports.

*See https://nj.playupusa.com/en-us/termsandconditions?id=512160.*

**Deposit Help**

How do I deposit funds?

To deposit funds, select the 'Deposit' button on the top right part of the screen. From there you will be presented with our available options.

- VIP Preferred – You will have to enroll with this processor to use this method. Once you enroll you are granted an individual limit. Play Up cannot change this limit, you will have to contact VIP preferred to do so. Once you are enrolled, enter the amount you'd like to deposit, if you have a promo code, tick the 'I have a promo code' box and enter. Then enter your Routing Number, Account Number, Drivers License Number and Expiration date to use this method.
- Play+ - You will have to enroll for a Play+ card account. You can do this right from the deposit method page. It will take the information you registered on Play Up with to start. More information on Play+ at the bottom of this page.
- Skrill – You will need an existing Skrill account to use this method. If you do not have one, you can visit their site through the deposit method page and sign up. If you have an existing Skrill account, enter the amount you'd like to deposit. Select the Skrill method. You will then be redirected to their login screen. Enter your details and confirm the account you'd like to deposit from.

**Withdrawal Help**

How do I withdraw my funds?

To withdraw your funds, you must have previously established an account with one of our deposit methods on the deposit page.

Once you the option will appear for you to withdraw to the saved account. Click your username in the top right corner to produce the drop-down menu. Then select 'Wallet' and then 'Withdraw'. Select the amount and the withdrawal method you'd like to receive your funds via and then submit.

*See https://nj.playupusa.com/en-us/faq.*

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

**FIGURE GROUP C**

77.     The aforementioned computer(s) of the Accused Instrumentalities include at least one receiver, which is configured to receive requests to notify individual users regarding the sporting event for which wagers can be placed.  More specifically, when a user logs into or accesses the infringing PlayUp branded Mobile Wagering Platform via the PlayUp Domains, the infringing apparatus receives a set of user credentials which serve as a request to be notified of available sporting events for which wagers can be placed.  On information and belief, once the user logs into or accesses the infringing PlayUp branded Mobile Wagering Platform via the PlayUp Domains, the infringing apparatus stores information regarding the request to be notified in memory.  The stored information is used, *inter alia*, to assist in designating the user as "logged in" or "logged out" of an account maintained on the PlayUp branded Mobile Wagering Platform.

78.     In addition, or in the alternative, the receiver of the PlayUp branded Mobile Wagering Platform is configured such that it receives incoming HTTP requests from users accessing the PlayUp Domains via a web browser or application.  Such HTTP requests initiate a dynamic and interactive session with the PlayUp branded Mobile Wagering Platform.  The incoming request for information is a request to be notified regarding available sporting events for which wagers can be placed; such requests are stored and satisfied when the infringing apparatus returns page content to the user via the PlayUp branded Mobile Wagering Platform.

79.     The apparatus of the Accused Instrumentalities includes a specially programmed processor, which detects postings of information regarding sporting events for which wagers can be placed and generates notification messages regarding such sporting events.  Such processor detects the posting of sporting event schedules, wager availability, wagering odds, wager popularity, sporting event scoring and statistics, sporting event results, and wager status.  Upon detection,

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                              33

the processor of the PlayUp branded Mobile Wagering Platform delivers notification messages, which are reflected and take the form of updated, new, or revised data displayed via the PlayUp Domains.  By way of example, the infringing processor detects the posting of updated odds for specific wagers, and thereupon generates and delivers notification messages to those who have requested such notifications via the PlayUp Domains.   On information and belief, such notifications are delivered to requestors when the computer of the infringing apparatus initiates a communication link with the browser via the PlayUp Domains, which are assembled and displayed on the communication device associated with the individual user (such as, for example, the PlayUp Mobile Application on the user mobile device).  *See* Figure Groups A and C.

80.     The computer of the Accused Instrumentalities is configured to receive bet messages transmitted from the communication devices of users of the PlayUp branded Mobile Wagering Platform via the PlayUp Domains.   Indeed, this is the primary purpose and objective of the Accused Instrumentalities.   More specifically, the user interfaces of the PlayUp Domains are specially programmed such that users can select from a menu of available sporting event wagers and transmit such wager selections ("bet messages") via the Internet to the servers and processors of the PlayUp branded Mobile Wagering Platform for fulfillment.  *See* Figure Groups A and C.

81.     On information and belief, the PlayUp branded Mobile Wagering Platform requires users to provide at least one global positioning device for each communication device.   Such global positioning devices determine the physical location of such communication devices, and are essential and required by PlayUp for all users of the Accused Instrumentalities; PlayUp thus places the whole infringing apparatus into service and otherwise establishes the manner of performance of the claimed elements and/or conditions participation in the wagering

opportunities upon the provision of such global positioning devices.  *See* Figure Group B.  More specifically, and on information and belief, in order to make beneficial use of the PlayUp branded Mobile Wagering Platform, users are required to accept and download, install, enable, and/or activate global positioning software on all devices from which wagers are able to be placed.  Such software is required to be actively installed or enabled as part of the registration, log-in, or wagering process, or is otherwise embedded into the PlayUp Domains for seamless automatic installation and enablement.  In addition, and/or in the alternative, the PlayUp branded Mobile Wagering Platform processes and assesses the respective global positioning devices of each communication device by identifying the specific network routing or IP address for each such communication device, or by processing functionally similar data.

82.   On information and belief, the PlayUp branded Mobile Wagering Platform is configured such that the global positioning data of the communication device is transmitted contemporaneous with the bet message, and is otherwise contained as part of the bet message.

83.   On information and belief, the computer/processor of the PlayUp branded Mobile Wagering Platform is configured such that it processes incoming bet messages for the purpose of allowing or disallowing the wagers associated therewith.   On information and belief, as part of the regulatory compliance protocols implemented by PlayUp, the decision to either allow or disallow a given wager is determined, at least in part, upon the information regarding the global position of the communication device from which the bet message originated.  *See* Figure Group B.

84.   The foregoing infringement on the part of PlayUp has caused past and ongoing injury to Plaintiff.  The specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '341 Patent.

85.     To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '341 Patent, such infringement is and will be necessarily willful and deliberate.

86.     Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

**COUNT II**
**Infringement of U.S. Patent No. 10,147,266**

87.     Plaintiff incorporates the above paragraphs by reference.

88.     Defendant has been on actual notice of the '266 Patent at least as early as the date it received service of the Original Complaint in this litigation.

89.     Upon information and belief, Defendant owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

90.     Upon information and belief, Defendant has directly infringed and continues to directly infringe at least Claim 1 of the '266 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.   Defendant directly makes the infringing Accused Instrumentalities at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom.   More specifically, and on information and belief, Defendant: (i) developed and maintains the infringing PlayUp Domains; (ii) authored and owns the source code on which the PlayUp branded Mobile Wagering Platform functions; (iii) took affirmative steps to assemble and finance the hardware (including servers and/or computers with receivers, memory, processors, and transmitters) on which the Accused Instrumentalities operate; (iv) manages and controls the functionality on all such hardware, including by managing and controlling the software in use on such hardware; (v) specifically embeds and/or requires the presence and use

of global positioning devices as part of the PlayUp branded Mobile Wagering Platform; (vi) assumes ownership, credit, and responsibility for the Accused Instrumentalities by its overt branding and advertising of same; and (vii) receives substantial financial returns from the infringing operations of the Accused Instrumentalities.  *See* Figure Groups A, B, and C. Defendant further directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them collectively available in the United States.  Further, and on information and belief, Defendant has directly infringed by using the infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities.  More specifically, in order to maintain legal compliance in the United States, PlayUp is required to periodically monitor and ensure that the Accused Instrumentalities are performing as designed and intended, including but not limited to the enforcement of geographical restrictions of use.  Such testing and legal compliance necessarily requires PlayUp to make and use the Accused Instrumentalities in an infringing manner.  Still further, Defendant is a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the infringing Accused Instrumentalities. *See* Figure Group A.

91.     The Accused Instrumentalities comprise an apparatus including a computer, wherein the computer is specially programmed for processing information for providing for a placement of a bet on or regarding a gaming activity, a gambling activity, or a sporting event.  As noted above, and on information and belief, the Accused Instrumentalities collectively comprise the PlayUp branded Mobile Wagering Platform, which is comprised of hardware (including servers) and software (including source code).  Such branded Mobile Wagering Platform of PlayUp is directly accessible to users in the United States through the PlayUp Domains.  On information and belief,

the PlayUp system comprises servers and/or computers with receivers, memory, processors, and transmitters, together with the interactive Internet domains and mobile applications of PlayUp which collectively operate as a single controlled apparatus to administer the PlayUp branded Mobile Wagering Platform in the United States.   The existence of the PlayUp branded Mobile Wagering Platform necessarily requires the presence and use of a specially programmed computer or computer system, including Internet servers.   As illustrated in Figure Group C, such computer is specially programmed for offering, accepting, monitoring, and fulfilling wagers made by individuals on various events, including sporting events.   Such activities comprise "processing information for providing for a placement of a bet on or regarding a gaming activity, a gambling activity, or a sporting event."   *See* Figure Group C.

92.     The apparatus of the Accused Instrumentalities includes a specially programmed processor, which detects postings of information regarding gaming activities, gambling activities, and/or sporting events for which wagers can be placed and generates notification messages regarding such sporting events and/or activities.   Such processor detects the posting of sporting event schedules, wager availability, wagering odds, wager popularity, sporting event scoring and statistics, sporting event results, and wager status.   Upon detection, the processor of the PlayUp branded Mobile Wagering Platform delivers notification messages, which are reflected and take the form of updated, new, or revised data displayed via the PlayUp Domains.   By way of example, the infringing processor detects the posting of updated odds for specific wagers, and thereupon generates and delivers notification messages via the PlayUp Domains.   On information and belief, such notifications are delivered to requestors when the computer of the infringing apparatus initiates a communication link with the browser via the PlayUp Domains ("electronic transmission"), which are received, assembled, and displayed on the communication

device associated with the individual user (such as, for example, the PlayUp Mobile Application on the user mobile device).  *See* Figure Groups A and C.

93.   The computer of the Accused Instrumentalities is configured to receive bet messages transmitted from the communication devices of users of the PlayUp branded Mobile Wagering Platform via the PlayUp Domains.   Indeed, this is the primary purpose and objective of the Accused Instrumentalities.   More specifically, the user interfaces of the PlayUp Domains are specially programmed such that users can select from a menu of available sporting event wagers and transmit such wager selections ("bet messages") via the Internet to the servers and processors of the PlayUp branded Mobile Wagering Platform for fulfillment.  *See* Figure Groups A and C.

94.   On information and belief, the PlayUp branded Mobile Wagering Platform requires users to provide at least one global positioning device for each communication device.   Such global positioning devices determine the physical location of such communication devices, and are essential and required by PlayUp for all users of the Accused Instrumentalities; PlayUp thus places the whole infringing apparatus into service and otherwise establishes the manner of performance of the claimed elements and/or conditions participation in the wagering opportunities upon the provision of such global positioning devices.  *See* Figure Group B.  More specifically, and on information and belief, in order to make beneficial use of the PlayUp branded Mobile Wagering Platform, users are required to accept and download, install, enable, and/or activate global positioning software on all devices from which wagers are able to be placed.  Such software is required to be actively installed or enabled as part of the registration, log-in, or wagering process, or is otherwise embedded into the PlayUp Domains for seamless automatic installation and enablement.  In addition, and/or in the alternative, the PlayUp branded Mobile Wagering Platform processes and assesses the respective global positioning devices of

each communication device by identifying the specific network routing or IP address for each such communication device, or by processing functionally similar data.

95. On information and belief, the PlayUp branded Mobile Wagering Platform is configured such that the global positioning data of the communication device is transmitted contemporaneous with the bet message, and is otherwise contained as part of the bet message.

96. On information and belief, the computer/processor of the PlayUp branded Mobile Wagering Platform is configured such that it processes incoming bet messages for the purpose of allowing or disallowing the wagers associated therewith. On information and belief, as part of the regulatory compliance protocols implemented by PlayUp, the decision to either allow or disallow a given wager is determined, at least in part, upon the information regarding the global position of the communication device from which the bet message originated. *See* Figure Group B.

97. The foregoing infringement on the part of PlayUp has caused past and ongoing injury to Plaintiff. The specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '266 Patent.

98. To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '266 Patent, such infringement is and will be necessarily willful and deliberate.

99. Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

## COUNT III
## Infringement of U.S. Patent No. 10,255,755

100. Plaintiff incorporates the above paragraphs by reference.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                                40

101.   Defendant has been on actual notice of the '755 Patent at least as early as the date it received service of the Original Complaint in this litigation.

102.   Upon information and belief, Defendant owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

103.   Upon information and belief, Defendant has directly infringed and continues to directly infringe at least Claim 2 of the '755 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.   Defendant directly makes the infringing Accused Instrumentalities at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom.   More specifically, and on information and belief, Defendant: (i) developed and maintains the infringing PlayUp Domains; (ii) authored and owns the source code on which the PlayUp branded Mobile Wagering Platform functions; (iii) took affirmative steps to assemble and finance the hardware (including servers and/or computers with receivers, memory, processors, and transmitters) on which the Accused Instrumentalities operate; (iv) manages and controls the functionality on all such hardware, including by managing and controlling the software in use on such hardware; (v) specifically embeds and/or requires the presence and use of global positioning devices as part of the PlayUp branded Mobile Wagering Platform; (vi) assumes ownership, credit, and responsibility for the Accused Instrumentalities by its overt branding and advertising of same; and (vii) receives substantial financial returns from the infringing operations of the Accused Instrumentalities.   *See* Figure Groups A, B, and C. Defendant further directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them collectively available in the United States.   Further, and on information and belief, Defendant has directly infringed by using the

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities.   More specifically, in order to maintain legal compliance in the United States, PlayUp is required to periodically monitor and ensure that the Accused Instrumentalities are performing as designed and intended, including but not limited to the enforcement of geographical restrictions of use.   Such testing and legal compliance necessarily requires PlayUp to make and use the Accused Instrumentalities in an infringing manner.   Still further, Defendant is a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the infringing Accused Instrumentalities. *See* Figure Group A.

104.   The Accused Instrumentalities comprise an apparatus including a computer, wherein the computer is specially programmed to perform the function of processing information for providing for a placement of a bet on or regarding a gaming activity, a gambling activity, or a sporting event.   As noted above, and on information and belief, the Accused Instrumentalities collectively comprise the PlayUp branded Mobile Wagering Platform, which is comprised of hardware (including servers) and software (including source code).   Such branded Mobile Wagering Platform of PlayUp is directly accessible to users in the United States through the PlayUp Domains.   On information and belief, the PlayUp system comprises servers and/or computers with receivers, memory, processors, and transmitters, together with the interactive Internet domains and mobile applications of PlayUp which collectively operate as a single controlled apparatus to administer the PlayUp branded Mobile Wagering Platform in the United States.   The existence of the PlayUp branded Mobile Wagering Platform necessarily requires the presence and use of a specially programmed computer or computer system, including Internet servers.   As illustrated in Figure Group C, such computer is specially programmed for offering,

accepting, monitoring, and fulfilling wagers made by individuals on various events, including sporting events. Such activities comprise a specially programmed computer for "processing information for providing for a placement of a bet on or regarding a gaming activity, a gambling activity, or a sporting event, a posting of information regarding the gaming activity, the gambling activity, or the sporting event."

105.     The apparatus of the Accused Instrumentalities includes a specially programmed processor, which is configured such that it detects and processes postings of information regarding gaming activities, gambling activities, and/or sporting events for which wagers can be placed and generates notification messages (with or using a computer) regarding such sporting events and/or activities. More specifically, such processor is specially configured such that it detects the posting of sporting event schedules, wager availability, wagering odds, wager popularity, sporting event scoring and statistics, sporting event results, and wager status. Upon detection, the processor of the PlayUp branded Mobile Wagering Platform is specially programmed such that it delivers and transmits notification messages, which are reflected and take the form of updated, new, or revised data displayed via the PlayUp Domains. By way of example, the infringing processor is programmed such that it detects the posting of updated odds for specific wagers, and thereupon generates and transmits notification messages via the PlayUp Domains. On information and belief, such notifications are programmed to be transmitted and delivered to requestors when the computer of the infringing apparatus initiates a communication link with the browser via the PlayUp Domains ("electronic transmission"), which are programmed to be received, assembled, and displayed on the communication device associated with the individual user (such as, for example, the PlayUp Mobile Application on the user mobile device). *See* Figure Groups A and C.

106.    The computer of the Accused Instrumentalities is specially programmed such that it receives bet
messages transmitted from the communication devices of users of the PlayUp branded Mobile
Wagering Platform via the PlayUp Domains.  Indeed, this is the primary purpose and objective
of the Accused Instrumentalities.  More specifically, the user interfaces of the PlayUp Domains
are specially programmed such that users can select from a menu of available sporting event
wagers and transmit such wager selections ("bet messages") via the Internet to the servers and
processors of the PlayUp branded Mobile Wagering Platform for fulfillment.  *See* Figure Groups
A and C.

107.    On information and belief, the PlayUp branded Mobile Wagering Platform is specially
programmed such that it requires users to provide at least one global positioning device for each
communication device.  Such global positioning devices determine the physical location of such
communication devices, and are essential and required by PlayUp for all users of the Accused
Instrumentalities; PlayUp thus places the whole infringing apparatus into service and otherwise
establishes the manner of performance of the claimed elements and/or conditions participation in
the wagering opportunities upon the provision of such global positioning devices.  *See* Figure
Group B.  More specifically, and on information and belief, in order to make beneficial use of
the PlayUp branded Mobile Wagering Platform, users are required to accept and download,
install, enable, and/or activate global positioning software on all devices from which wagers are
able to be placed.  Such software is required to be actively installed or enabled as part of the
registration, log-in, or wagering process, or is otherwise embedded into the PlayUp Domains for
seamless automatic installation and enablement.   In addition, and/or in the alternative, the
PlayUp branded Mobile Wagering Platform is specially programmed such that it processes and
assesses the respective global positioning devices of each communication device by identifying

the specific network routing or IP address for each such communication device, or by processing functionally similar data.

108.   On information and belief, the PlayUp branded Mobile Wagering Platform is specially programmed such that the global positioning data of the communication device is transmitted contemporaneous with the bet message, and is otherwise contained as part of the bet message.

109.   On information and belief, the computer/processor of the PlayUp branded Mobile Wagering Platform is specially programmed such that it processes incoming bet messages for the purpose of allowing or disallowing the wagers associated therewith.   On information and belief, as part of the regulatory compliance protocols implemented by PlayUp, the decision to either allow or disallow a given wager is determined, at least in part, upon the information regarding the global position of the communication device from which the bet message originated. *See* Figure Group B.

110.   The foregoing infringement on the part of PlayUp has caused past and ongoing injury to Plaintiff.   The specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '755 Patent.

111.   To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '755 Patent, such infringement is and will be necessarily willful and deliberate.

112.   Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

## COUNT IV
## Infringement of U.S. Patent No. 9,965,920

113.   Plaintiff incorporates the above paragraphs by reference.

114.   Defendant has been on actual notice of the '920 Patent at least as early as the date it received service of the Original Complaint in this litigation.

115.   Upon information and belief, Defendant owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

116.   Upon information and belief, Defendant has directly infringed and continues to directly infringe at least Claim 16 of the '920 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.   Defendant directly makes the infringing Accused Instrumentalities at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom.   More specifically, and on information and belief, Defendant: (i) developed and maintains the infringing PlayUp Domains; (ii) authored and owns the source code on which the PlayUp branded Mobile Wagering Platform functions; (iii) took affirmative steps to assemble and finance the hardware (including servers and/or computers with receivers, memory, processors, and transmitters) on which the Accused Instrumentalities operate; (iv) manages and controls the functionality on all such hardware, including by managing and controlling the software in use on such hardware; (v) specifically embeds and/or requires the presence and use of global positioning devices as part of the PlayUp branded Mobile Wagering Platform; (vi) assumes ownership, credit, and responsibility for the Accused Instrumentalities by its overt branding and advertising of same; and (vii) receives substantial financial returns from the infringing operations of the Accused Instrumentalities.   *See* Figure Groups A, B, and C. Defendant further directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them collectively available in the United States.   Further, and on information and belief, Defendant has directly infringed by using the

infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities.  More specifically, in order to maintain legal compliance in the United States, PlayUp is required to periodically monitor and ensure that the Accused Instrumentalities are performing as designed and intended, including but not limited to the enforcement of geographical restrictions of use.  Such testing and legal compliance necessarily requires PlayUp to make and use the Accused Instrumentalities in an infringing manner.  Still further, Defendant is a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the infringing Accused Instrumentalities. *See* Figure Group A.

117.   The Accused Instrumentalities comprise an apparatus including a computer, wherein the computer is specially programmed for processing information for providing for a placement of a bet on or regarding a sporting event.  As noted above, and on information and belief, the Accused Instrumentalities collectively comprise the PlayUp branded Mobile Wagering Platform, which is comprised of hardware (including servers) and software (including source code).  Such branded Mobile Wagering Platform of PlayUp is directly accessible to users in the United States through the PlayUp Domains.  On information and belief, the PlayUp system comprises servers and/or computers with receivers, memory, processors, and transmitters, together with the interactive Internet domains and mobile applications of PlayUp which collectively operate as a single controlled apparatus to administer the PlayUp branded Mobile Wagering Platform in the United States.  The existence of the PlayUp branded Mobile Wagering Platform necessarily requires the presence and use of a specially programmed computer or computer system, including Internet servers.  As illustrated in Figure Group C, such computer is specially

programmed for offering, accepting, monitoring, and fulfilling wagers made by individuals on various events, including sporting events.

118.    The apparatus of the Accused Instrumentalities includes a specially programmed processor, which detects postings of information regarding sporting events for which wagers can be placed via the Internet, and generates notification messages regarding such sporting events.   More specifically, such processor is specially programmed such that it detects the posting of sporting event schedules, wager availability, wagering odds, wager popularity, sporting event scoring and statistics, sporting event results, and wager status.   Upon detection, the processor of the PlayUp branded Mobile Wagering Platform is specially programmed such that it transmits and delivers notification messages, which are reflected and take the form of updated, new, or revised data displayed via the PlayUp Domains.   By way of example, the infringing processor is specially programmed such that it detects the posting of updated odds for specific wagers, and thereupon generates and delivers notification messages via the PlayUp Domains.   On information and belief, such notifications are delivered to requestors when the computer of the infringing apparatus initiates a communication link with the browser via the PlayUp Domains, which are received, assembled, and displayed on the communication device associated with the individual user (such as, for example, the PlayUp Mobile Application on the user mobile device).   *See* Figure Groups A and C.

119.    The computer of the Accused Instrumentalities is specially configured to receive bet messages transmitted from the communication devices of users of the PlayUp branded Mobile Wagering Platform via the PlayUp Domains.   Indeed, this is the primary purpose and objective of the Accused Instrumentalities.   More specifically, the user interfaces of the PlayUp Domains are specially programmed such that users can select from a menu of available sporting event wagers

and transmit such wager selections ("bet messages") via the Internet to the servers and processors of the PlayUp branded Mobile Wagering Platform for fulfillment.  *See* Figure Groups A and C.

120.   On information and belief, the PlayUp branded Mobile Wagering Platform requires users to provide at least one global positioning device for each communication device.  Such global positioning devices determine the physical location of such communication devices, and are essential and required by PlayUp for all users of the Accused Instrumentalities; PlayUp thus places the whole infringing apparatus into service and otherwise establishes the manner of performance of the claimed elements and/or conditions participation in the wagering opportunities upon the provision of such global positioning devices.  *See* Figure Group B.  More specifically, and on information and belief, in order to make beneficial use of the PlayUp branded Mobile Wagering Platform, users are required to accept and download, install, enable, and/or activate global positioning software on all devices from which wagers are able to be placed.  Such software is required to be actively installed or enabled as part of the registration, log-in, or wagering process, or is otherwise embedded into the PlayUp Domains for seamless automatic installation and enablement.  In addition, and/or in the alternative, the PlayUp branded Mobile Wagering Platform processes and assesses the respective global positioning devices of each communication device by identifying the specific network routing or IP address for each such communication device, or by processing functionally similar data.

121.   On information and belief, the PlayUp branded Mobile Wagering Platform is configured such that the global positioning data of the communication device is transmitted contemporaneous with the bet message, and is otherwise contained as part of the bet message.

122.   On information and belief, the computer/processor of the PlayUp branded Mobile Wagering Platform is configured such that it processes incoming bet messages for the purpose of allowing or disallowing the wagers associated therewith.   On information and belief, as part of the regulatory compliance protocols implemented by PlayUp, the decision to either allow or disallow a given wager is determined, at least in part, upon the information regarding the global position of the communication device from which the bet message originated.  *See* Figure Group B.

123.   On information and belief, the Accused Instrumentalities further comprise video recording and/or video conferencing devices which are configured to obtain and/or record live video information regarding the sporting events for which wagers can be placed.   The Accused Instrumentalities further comprise transmitters, which are programmed so as to transmit such video information to users of the infringing system via the PlayUp Domains.   On information and belief, such video information is transmitted and delivered to users when the computer of the infringing apparatus initiates a communication link with the browser via the PlayUp Domains, which are received, assembled, and displayed on the communication device associated with the individual user (such as, for example, the PlayUp Mobile Application on the user mobile device) in the form of live game status updates.  *See* Figure Groups A, C, and D.



*See https://nj.playupusa.com/en-us/live?id=591481.*

**FIGURE GROUP D**

124.    The foregoing infringement on the part of PlayUp has caused past and ongoing injury to Plaintiff.  The specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '920 Patent.

125.    To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '920 Patent, such infringement is and will be necessarily willful and deliberate.

126.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

**PRAYER FOR RELIEF**

WHEREFORE, Beteiro, LLC respectfully requests the Court enter judgment against Defendant as follows:

1.        Declaring that Defendant has infringed each of the Asserted Patents;

2.      Awarding Beteiro, LLC its damages suffered because of Defendant's infringement of the Asserted Patents;

3.      Awarding Beteiro, LLC its costs, reasonable attorneys' fees, expenses, and interest;

4.      Granting a permanent injunction pursuant to 35 U.S.C. § 283, enjoining Defendants from further acts of infringement with respect to the Asserted Patents;

5.      Awarding Beteiro, LLC ongoing post-trial royalties for infringement of the non-expired Asserted Patents; and

6.      Granting Beteiro, LLC such further relief as the Court finds appropriate.

## JURY DEMAND

Beteiro, LLC demands trial by jury, under Fed. R. Civ. P. 38.

Dated:  November 8, 2021

Respectfully Submitted

*/s/ M. Scott Fuller*

M. Scott Fuller
   Texas Bar No. 24036607
   sfuller@ghiplaw.com
Randall Garteiser
   Texas Bar No. 24038912
   rgarteiser@ghiplaw.com

**GARTEISER HONEA, PLLC**
119 W. Ferguson Street
Tyler, Texas 75702
Telephone: (903) 705-7420

**ATTORNEYS FOR PLAINTIFF
BETEIRO, LLC**